IV.

Although White was charged with a heinous crime, the United States Constitution provides him with the right to effective assistance of counsel. White's counsel's failure to perform his duties in a reasonably competent manner deprived White of this constitutional right. We therefore AFFIRM the district court and grant a conditional writ of habeas corpus, giving the State of Ohio one hundred eighty days in which to provide White a new trial or release him.

RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2000 FED App. 0419P (6th Cir.)
File Name: 00a0419p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

BENJAMIN WHITE,
          *Petitioner-Appellee,*

          *v.*                                    No. 98-4267

FRED MCANINCH,
          *Respondent-Appellant.*

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 95-00067—Algenon L. Marbley, District Judge.

Argued: November 1, 1999

Decided and Filed: December 21, 2000

Before: MERRITT and NELSON, Circuit Judges;
          OLIVER, District Judge.*

_____

*The Honorable Solomon Oliver, Jr., United States District Judge for the Northern District of Ohio, sitting by designation.

---

## COUNSEL

---

**ARGUED:**    Jonathan R. Fulkerson, OFFICE OF THE ATTORNEY GENERAL, CAPITAL CRIMES SECTION, Columbus, Ohio, for Appellant. John H. Forg, Cincinnati, Ohio, for Appellee. **ON BRIEF:** Jonathan R. Fulkerson, OFFICE OF THE ATTORNEY GENERAL, CAPITAL CRIMES SECTION, Columbus, Ohio, for Appellant. John H. Forg, Cincinnati, Ohio, for Appellee.

---

## OPINION

---

OLIVER, District Judge.  Fred McAninch, the warden of the Chillicothe Correctional Institute, and the respondent in these proceedings, appeals from the district court's judgment granting a writ of habeas corpus to petitioner Benjamin White pursuant to 28 U.S.C. § 2254.  White's petition alleged, among other grounds, ineffective assistance of counsel. Because we conclude that the district court correctly found that White was unconstitutionally denied the effective assistance of counsel under the Sixth Amendment, we affirm the judgment of the district court.

### I.

### A.

White was indicted on June 20, 1988, by the Scioto County Grand Jury on one count of rape.  He was charged with engaging in sexual conduct with Juanita Adkins, his step-daughter, when she was less than thirteen years of age, in

While the State may have produced evidence of each of the elements of the crime, viewing the trial in its entirety, we conclude that there is a reasonable probability that but for McCrae's deficient performance, White may have been found not guilty.  First, testimony about the uncharged act pervaded the trial, and a number of witnesses discussed the act in far more detail than the acts forming the basis of the indictment. Second, the victim's testimony with regard to where and when White forced her to engage in oral sex was largely uncorroborated.  Third, the court instructed the jury that the meaning of "sexual conduct" included "vaginal intercourse" and was never asked to give a limiting instruction on how the intercourse incident could be used by the jury.  In a case such as this, where so little evidence was adduced in support of the charges in the indictment, McCrae needed to be doubly careful to ensure that prejudicial evidence did not improperly persuade the jury to convict White.  However, under the circumstances, the jury had reason to believe that it could consider the uncharged incident in determining White's guilt. The damaging nature of the evidence along with the extent of the testimony presented during the trial, "may well have provided the jury with the final quantum of evidence upon which they convicted White of rape." *White v. McAnich*, No. C-2-95-67 (S.D. Ohio 1998).  In sum, we find that counsel's errors with respect to the uncharged act of sexual intercourse between White and the victim were so egregious as to undermine our confidence that White's trial produced a just result.[3]

---

[3]Respondent strenuously argues that McCrae pursued numerous theories in an effort to establish that White was not guilty of the crime charged; *e.g.*, that the victim and her mother fabricated the story to keep White in jail long enough to steal all of his money and leave town, that the victim's testimony was inconsistent as to  where and when the rapes occurred, that the victim lied about the rapes in order to punish White for seeing another woman.  Respondent's argument misses the mark.  Had McCrae not chosen also to pursue the "strategy" that the victim was lying about the incident of sexual intercourse, one of McCrae's other strategies may likely have proven successful.

provided no dates or locations for any sexual acts other than the uncharged act of intercourse. Thus, although Respondent makes much of the fact that White "confessed" to Detectives Jackson and Pratt, such confession could not be used to establish the elements of statutory rape under Ohio Rev. Code § 2907.02. Additionally, White's physical condition arguably affected his lucidity during this interview. *See* J.A. at 569 (testimony by Detective Pratt that White was very "shaky" and "nervous" when he admitted to having engaged in oral sex with the victim).

Although Rebecca Adkins, the victim's mother, testified that she caught the victim and White engaging in oral sex in Virginia, this does not corroborate any alleged incidents that occurred in Scioto County. Moreover, McCrae pursued in great detail the circumstances surrounding how the victim's mother became aware of the sexual intercourse incident between her daughter and White, but neither the prosecutor nor McCrae spent a significant amount of time with Ms. Adkins establishing where or when the acts of oral sex alleged in the indictment occurred. Indeed, Ms. Adkins testified that she was unaware of any such activity between White and her daughter until her daughter finally talked to her about it in 1988.

The trial court's instructions to the jury on the definition of "sexual conduct," taken in conjunction with the extensive evidence of the uncharged act of sexual intercourse, may have also contributed to the jury's misunderstanding of the proper use of such evidence. While at trial the prosecutor limited the indictment to only acts of oral sex, the trial court instructed the jury that "sexual conduct" within the meaning of the indictment, included "vaginal intercourse." J.A. at 786. The court was never asked to provide, nor did it ever on its own provide, a limiting instruction to the jury on how it was permitted to use the evidence of sexual intercourse under Ohio R. Evid. Rule 404(b). Thus, the jury was unaware that the act could not be used to prove White's propensity for engaging in the type of behavior charged in the indictment. Ohio R. Evid. Rule 404(b).

violation of Ohio Rev. Code § 2907.02(A)(1)(b).[1] Following a period of incarceration based on unrelated charges, and a period of hospitalization for drug and alcohol treatment, White was arraigned on August 19, 1988. Although an attorney by the name of George Davis III had been appointed to represent White, White states that he never met with or spoke to Mr. Davis and Mr. Davis did not appear on White's behalf at the arraignment. After White entered a plea of not guilty, the trial judge, who had spotted attorney Charles McCrae in the back of the courtroom, appointed Mr. McCrae to represent White. A jury trial commenced on September 12, 1988, and on September 14, 1988, White was convicted as charged. He was thereafter sentenced to a prison term of eight to twenty-five years.

White appealed to the Court of Appeals for the Fourth Appellate District. On June 20, 1990, the court affirmed his conviction, with one judge dissenting on the ground that White had been denied effective assistance of trial counsel. The Supreme Court of Ohio granted White leave to pursue a delayed direct appeal, but affirmed the judgment against him on January 29, 1992. White next filed a *pro se* petition for post-conviction relief in the state trial court in February of 1993. The trial court dismissed White's application on May 28, 1993, and the state court of appeals affirmed the decision on August 1, 1994.

White filed his petition for writ of habeas corpus in the U.S. District Court for the Southern District of Ohio on January 19,

---

[1] The indictment reads:

The Jurors of the Grand Jury of the State of Ohio, within and for the body of [Scioto County, Ohio] . . . , on their oaths, in the name and by the authority of the State of Ohio, do find and present that on or about the day of Between '83 and '87 at Scioto County, Ohio, Benjamin White did engage in sexual conduct with Juanita Adkins who was not his spouse and was less than thirteen years of age.

Joint Appendix ("J.A.") at 43.

1995. In June of 1995, Respondent filed his return of writ to White's petition, and moved to dismiss a number of White's claims. The district court dismissed some of White's claims, but found that he had made a *prima facie* showing that he had been denied effective assistance of counsel as to the following issues: failure to conduct adequate pretrial preparation, failure to assert an arguably meritorious speedy trial defense, eliciting evidence of uncharged sexual acts with the same underage victim, and failing to request a limiting instruction on the jury's consideration of this evidence. It further found that White had made a *prima facie* showing of ineffective assistance of appellate counsel for failing to raise these matters on direct appeal.

In January 1997, White's case was referred to a magistrate judge for an evidentiary hearing. On May 19, 1997, a hearing was held on White's claims that remained after the district court's disposition of Respondent's motion to dismiss. The magistrate judge issued a report and recommendation on September 11, 1997, recommending that a writ issue unless the State afforded White a new trial within ninety days. The magistrate's decision was based on the ground that White's trial counsel had rendered ineffective assistance of counsel by failing to object when the prosecutor elicited testimony regarding an uncharged act of sexual intercourse between White and the victim and for thereafter exploring the uncharged act in great detail on his examination of the victim as well as several other witnesses. The magistrate judge recommended dismissing White's other claims. The district court adopted the report and recommendation over Respondent's objections and granted a conditional writ ordering White's release unless he was retried within one-hundred eighty days.

### B.

On appeal, Respondent challenges the district court's conclusion that White's counsel rendered ineffective assistance. This issue requires a detailed look at the trial record as well as the events leading up to the trial.

victim, not only from the victim herself, but through testimony from a number of other witnesses, was especially damaging because it tended strongly to corroborate the indictment's allegation of a sexual relationship between White and his stepdaughter. The circumstances surrounding the uncharged act also painted White as an immoral and despicable character, someone who would have sexual intercourse with his thirteen-year-old stepdaughter to relieve the emotional effect of his mother being taken to a nursing home. The risk of prejudice from this evidence would have made a reasonably competent attorney doubly cautious about its potential misuse by the jury.

Respondent argues that in determining whether White was prejudiced by McCrae's performance, the district court improperly made credibility determinations and suggested that if it had been the factfinder, it would have reached a different verdict than did the jury. We find there was nothing improper about the district court's evaluation of the evidence or its conclusion that there was room for the possibility that evidence of the uncharged act may have improperly swayed the jury toward convicting White.

As the district court noted, the victim's testimony with regard to when White began forcing her to perform oral sex and where these acts actually took place was not specific.[2] While a number of witnesses testified that the victim had informed them of these incidents, none had first-hand knowledge of any act of oral sex that took place in Scioto County between the dates alleged in the indictment. The only instance of sexual conduct that Detective Pratt was able to discuss in detail on either direct or cross was the sexual intercourse incident. Other than that, he testified only that White had admitted to him that he had had "sexual encounters" with the victim. He did not provide any date or location for these encounters. Likewise, Detective Jackson

---

[2] Nevertheless, as Respondent points out, she did testify that she and White had engaged in oral sex in Scioto County sometime between 1983 and her thirteenth birthday.

number of witnesses who corroborated the victim's story, several of whom testified that White himself had admitted to the uncharged act, was simply incompetent given that McCrae knew he had no evidence to refute the testimony. Even McCrae's articulated strategy wholly fails to explain why he decided to question the victim's mother about the incident - after three witnesses had already corroborated the victim's story. McCrae's failure to request a limiting instruction with respect to the intercourse issue only compounded these problems. In sum, no reasonably competent attorney would have adopted McCrae's strategy in this case, or at the very least, decided not to abandon the strategy once it was patently clear that it would not be fruitful, and very likely harmful.

The court's inquiry now turns to whether White was prejudiced by McCrae's deficient performance. We find that he was.

At the outset, we note that evidence of uncharged acts is generally inadmissible. *See* Ohio R. Evid. Rule 404(b) (providing, same as Fed. R. Evid. Rule 404(b), that "evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith"). As the Ohio Supreme Court has noted:

> The average individual is prone to much more readily believe that a person is guilty of the crime charged if it is proved to his satisfaction that the defendant has committed a similar crime. To guard against that evil, the general rule forbids the introduction of any evidence tending to show that the accused has committed any crime wholly independent of that offense for which he is on trial.

*State v. Hector*, 19 Ohio St.2d 167, 175, 249 N.E. 912, 916-17 (1969). Although exceptions to this general rule exist, *e.g.*, to show motive, opportunity, intent, preparation, etc., rarely does a defendant present evidence of a prior crime in support of his own defense. Rather, permitting the jury to hear about an act of sexual intercourse between White and the

At the evidentiary hearing below, White testified that McCrae met with him only twice prior to the trial, once for a few minutes immediately following the arraignment, and again on the morning of trial. There is some dispute as to whether McCrae also visited White at the county jail later on the day of the arraignment. McCrae claimed that he attempted to meet with White on a number of other occasions, but that White had refused to see him. McCrae, who was familiar with White's father through another matter, spoke with White's father about the allegations against White on several occasions.

According to McCrae, when he spoke with White on the day of the arraignment, White told him that "he believed he had probably done what they were accusing him of." J.A. at 842. McCrae also testified that White told him that he did not believe that two of the main witnesses, the victim and her mother, would appear for a trial and that there would therefore be no trial. White denies that he made either statement. White's father also allegedly told McCrae that neither witness would appear for trial. McCrae did not interview Juanita or her mother in order to verify White's alleged statement that they did not intend to appear at trial.

McCrae did not seek or obtain formal discovery or a bill of particulars prior to the trial. White had asked McCrae not to file discovery motions, and McCrae had a policy not to file discovery motions against the wishes of a client. He did not seek a bill of particulars, believing it to be unnecessary. At the evidentiary hearing, he explained that his experience was that prosecutors did not divulge more facts than those already set forth in the indictment. He further explained that he believed the best method of discovering information about the allegations against White was to meet informally with the assistant prosecutor. He states that he did this on several occasions, although he never met with the assistant prosecutor responsible for trying the case.

It was not until the Friday before the trial was to commence, when McCrae learned that witnesses had been

subpoenaed and would appear, that McCrae prepared three motions to file on the morning of the trial. The first was a motion to suppress incriminating statements that White had made to law enforcement officers on grounds that he had been mentally incapacitated at the time of the interrogation. The second requested an evidentiary hearing on the motion to suppress. The third was a motion to dismiss the indictment on the ground that the indictment did not specifically identify the time at which the alleged offense had occurred. The prosecutor objected to the motions on the grounds of untimeliness, after which McCrae explained to the trial court that he had not learned until a few days earlier that the witnesses were going to appear. The trial court overruled the prosecutor's objections, held an evidentiary hearing on the motion to suppress, and, ultimately rejected the motions to suppress and to dismiss. McCrae admitted that none of these motions had been shown to or discussed with White, but again asserted that this was because White had refused to see him.

McCrae did not review the videotaped statement of the victim taken on May 12, 1988, by Detective Pratt, one of the investigative officers on the case, at which taping Angela Kemper, a Children's Services caseworker, was present. Nor did he review the videotaped Grand Jury statement of Kemper prior to the trial. Both tapes contained information indicating that the victim and White had engaged in sexual intercourse shortly before White was indicted -- after the victim had turned thirteen. At least with respect to the victim's tape, McCrae testified that it was not necessary to review the tape and that he only needed to know about it. He also stated that he had decided as a matter of strategy that not seeing the tape would better enable him to "ambush" the victim during cross-examination. J.A. at 860. In spite of this initial tactical decision, McCrae obtained leave from the court to conduct an *in camera* review of the videotape in the middle of trial.

McCrae also failed to seek a pelvic examination of the victim before trial. He explained at the evidentiary hearing that he chose not to do so because he thought that those

Further, there is simply no explanation for McCrae's failure to request a limiting instruction on how the jury was permitted to use the evidence of the intercourse incident. To the extent evidence of the incident may have been properly admitted, it could only be used to show "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Ohio R. Evid. Rule 404(b). However, the jury was never so instructed. After allowing the jury to hear testimony at great length about the incident, it was incompetent for McCrae not to ask the judge to remind the jury that the act was not direct evidence of the crime charged in the indictment.

Respondent argues that White's uncooperativeness induced any deficient performance on McCrae's part and that White's claim of ineffectiveness must be viewed suspiciously because McCrae acted according to White's instructions on strategy. We find this argument wholly without merit. There is nothing in the record to suggest that White prohibited McCrae from reviewing the victim's videotaped statement with Pratt and Kemper . To the contrary, McCrae testified that he deliberately failed to review the tape in order to "ambush" the victim. Even assuming that White was completely uncooperative, had McCrae reviewed the tape, he would have learned of the incident of sexual intercourse between the victim and White. Moreover, had McCrae taken the time to review the videotape of the Grand Jury, he would have learned that Angela Kemper would testify that the victim had informed her about the uncharged act. White's alleged non-cooperation simply does not exonerate McCrae's consistent pattern of neglecting his essential function of investigating the claims against his client.

Having thoroughly reviewed the record, we conclude that McCrae's "strategy" of failing to object to, and affirmatively eliciting, testimony regarding an uncharged act of sexual intercourse between White and the victim falls well below an objective standard of reasonableness. McCrae's deficient pretrial preparation renders the strategy highly suspect. His failure to appreciate the significance of the testimony of a

was lying about the incident in the few minutes between reviewing the tape and beginning cross examination. On cross, McCrae proceeded to ask the victim numerous questions about the uncharged act of sexual intercourse. As can be seen from the trial excerpts above, the victim was able to provide many details with respect to exactly how and when the incident occurred. Although the uncharged act took place outside of the time frame in the indictment and was not evidence of oral sex between the victim and White, McCrae did not ask the judge at any time during or after his examination of the victim to explain to the jury that the act could not be used as evidence of the crime charged.

Even when it became clear that other witnesses could corroborate the victim's story - with testimony that White himself had admitted to the uncharged act - McCrae did not abandon his theory that the victim was lying about the incident, and thus about the allegations in the indictment. Detective Jackson and Detective Pratt both testified without objection that White had admitted that he had engaged in intercourse with the victim shortly before he was indicted. After the Detectives testified that White had confessed to them about the incident, Angela Kemper was permitted to testify that the victim had told her that she and White had engaged in sexual intercourse. With no likely benefit, McCrae proceeded to elicit testimony about the incident from the victim's mother on direct examination. Ms. Adkins also testified that White had admitted that he had engaged in sexual intercourse with her daughter. Given that McCrae had no evidence to refute the victim's story about the uncharged act, his decision to pursue his "strategy" with respect to the uncharged act even after these individuals testified was manifestly unreasonable and falls far outside the range of what can be considered professionally competent assistance. *See* J.A. at 912 ("Q: Mr. McCrae, I'd like to ask, in that strategy, prior to asking her those questions about the uncharged sexual conduct, did you have any evidence whatsoever, circumstantial, direct, that you would be able to present to show or to refute her testimony about the uncharged sexual conduct? A: No, I didn't.").

results would have been harmful to White's case. Because Ohio law prohibited him from exploring the victim's sexual history, McCrae felt that if the pelvic examination had revealed penetration, it would suggest to the jury that White was responsible. McCrae also pointed out that White was charged with engaging in oral sex with the victim, not with engaging in sexual intercourse. That notwithstanding, the trial transcript reveals that McCrae moved for a pelvic examination of the victim during the trial. Arguing that the test would show that the victim was a virgin, he claimed that the pelvic exam would impeach the victim's credibility with respect to her testimony about the uncharged act of sexual intercourse. The trial judge denied McCrae's request as untimely.

The jury trial commenced on September 12, 1988. As noted above, White was charged in the indictment with "engag[ing] in sexual conduct with Juanita Adkins who was not his spouse and was less than thirteen years of age" between the dates of 1983 and 1987. The victim turned thirteen on August 15, 1987. Thus, any incidents of sexual conduct which occurred at any time after August 15, 1987, were beyond the scope of the indictment. Further, because the State had narrowed its case against White to only acts of oral sex, any incidents other than those involving oral sex were beyond the scope of the State's case against White.

Nevertheless, during his case in chief, the prosecutor inquired of the victim as to whether she and White had ever engaged in any sexual conduct other than that alleged in the indictment. McCrae did not object, and the victim stated that she and White had had intercourse on one occasion, referring to the time that she had had intercourse with White shortly before he was indicted:

Q: Juanita, you testified there was oral sex and some fondling. Has there been anything else between you and your father?

A: We had sex one time at 414 Sinton when they took my Grandmaw away to the nursing home.

J.A. at 488.

On cross examination of the victim, McCrae asked numerous questions about the sexual intercourse incident. A review of the trial transcript reveals that McCrae went into great detail with the victim about the incident, including how and when it happened:

Q: And on this day you're talking about did [your grandmother] have to be rushed to the hospital?

A: Yes, sir.

Q: And would I also be correct in saying that Ben was upset about that?

A: Yes, sir.

Q: And he was drinking?

A: Yes, sir.

***

Q: He was crying, is that correct?

A: Yes, sir.

Q: Would it be true that he sent you home?

A: After we had sexual intercourse.

Q: Before that?

A: Not before.

Q: Never sent you home, not one time?

A: He sent me to get him a beer and then I came back.

***

As the district court noted, there was nothing in the record to suggest that McCrae was aware of the uncharged act of sexual intercourse before the trial. Moreover, he seemed totally unaware of the fact that there were a number of witnesses who would corroborate the victim's story. Although McCrae met with White and White's father several times prior to trial, there is no evidence that either of these men gave McCrae any information about the uncharged act. Although McCrae indicates that White told him that he "believed that he had probably done what they were accusing him of," J.A. at 842, White was not accused of having had sexual intercourse with the victim. McCrae did not conduct formal discovery, and the record does not show that White's meetings with the assistant prosecutor produced any information about the uncharged act. Finally, McCrae did not review prior to trial either the victim's or Angela Kemper's videotapes, both of which discussed the uncharged act.

McCrae's woefully inadequate trial preparation renders it highly implausible that he developed his theory that the victim was lying about the uncharged act, and thus, the numerous episodes of oral sex as well, prior to trial. Indeed, a review of the trial record reveals that a much more likely scenario is that McCrae first learned of the victim's allegations with regard to the uncharged act when she answered the prosecutor's question about any activity other than fondling between her and White in the affirmative. McCrae, who was unable to explain why he failed to object to the prosecutor's question, appears to have been taken quite by surprise by the victim's response. Abandoning his tactic to "ambush" the victim by not reviewing her videotape prior to questioning her, McCrae sought leave to review the videotape of her interview with Pratt and Kemper immediately after the State had completed its questioning of the victim. Upon reviewing the tape, McCrae realized that the victim had informed Pratt and Kemper of the incident. Rather than request a limiting instruction with regard to the uncharged act after reviewing the tape, McCrae immediately began his cross examination of the victim. Thus, he seems to have formulated his "strategy" to persuade the jury that the victim

further asserts that the decision to pursue the theory that the victim was lying about the uncharged act and therefore the acts alleged in the indictment is exactly the type of tactical decision that the *Strickland* Court held should not be "second-guessed."

Although the *Strickland* Court warned that counsel's trial tactics should not be subject to "second-guessing" by reviewing courts, "even deliberate trial tactics may constitute ineffective assistance of counsel if they fall outside the wide range of professionally competent assistance." *Martin v. Rose*, 744 F.2d 1245, 1249 (6th Cir. 1984) (internal quotations and citation omitted). As this court has recognized, "the label 'strategy' is not a blanket justification for conduct which otherwise amounts to ineffective assistance of counsel." *Lovett v. Foltz*, No. 88-1682, 1989 WL 101522 at * 4 (6th Cir. Sept. 5, 1989) (unpublished opinion). The determination as to whether counsel's trial strategy amounts to ineffective assistance of counsel should be made with respect to the thoroughness of the pretrial investigation that counsel conducted. The more thorough the investigation, the more deference the trial strategy receives, while strategic decisions made after incomplete investigations receive less:

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Strickland*, 466 U.S. at 690-91, 104 S.Ct. at 2066. *See also Meeks v. Bergen*, 749 F.2d 322 (6th Cir. 1984).

Q:   What day of the week was it?

A:   I don't remember. I think it was Saturday. I was out of school.

        ***

Q:   So on a Saturday . . . what month was it?

        ***

A:   May, something like that.

        ***

Q:   You brought him the beer back.

A:   Yes, sir.

Q:   And then he drank it?

A:   Yes, sir.

Q:   He drank the beer and then somehow or another you all got to doing what? That led to this?

A:   We had sexual intercourse.

Q:   How did it come to lead to that?

A:   He took me in the bedroom.

Q:   He took you in the bedroom?

A:   Yes, sir.

Q:   How did he take you in the bedroom?

A:   I walked. And he walked.

Q:   You walked and he walked. Did he grab you in some way?

A:  No, sir.

Q:  Did he push you in some way?

A:  No, sir.

Q:  Well, that part is true, because you're bigger than he is, aren't you?

Mr. Kegley:  Objection.

A:  Big deal.

The court:    Overruled.

Q:  Aren't you?  Let me demonstrate.  Stand up.  (To the Defendant) You stand up.  You're much bigger than he is.  Thank you.  Have a seat.

A:  His arms are a little bit bigger than mine are, too.

Q:  You walked into the bedroom on your own?

A:  Yes, sir.

Q:  And he was behind you?

A:  Yes, sir.

Q:  And then you took off your clothes?

A:  He helped me.

Q:  He helped you take your clothes off?

A:  Yes, sir.

Q:  And he then told you to go home and stop this foolishness?

A:  No, he didn't.

Turning to the prejudice prong, the *Strickland* Court concluded that it is not enough for a defendant to show that his counsel's "errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693, 104 S.Ct. at 2067. Rather, the defendant must be able to demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. at 2068.  Unless confidence in the outcome is undermined by the errors, "it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable." *Id.* at 687, 104 S.Ct. at 2064.

An ineffective assistance claim presents mixed questions of law and fact; accordingly, we review *de novo* the conclusion that White received ineffective assistance of counsel.  *See, e.g., Rickman v. Bell*, 131 F.3d 1150, 1153 (6th Cir. 1997). Because White filed his habeas petition prior to April 24, 1996, the effective date of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), Pub.L. No. 104-132, 110 Stat. 1214 (1996), pre-AEDPA law applies. *See Lindh v. Murphy*, 521 U.S. 320, 117 S.Ct. 2059 (1997); *Carter v. Bell*, 218 F.3d 581, 591 (6th Cir. 2000). Although state court findings of fact made in the course of deciding an ineffective assistance claim are presumptively correct under pre-AEDPA 28 U.S.C. § 2254(d), determinations regarding the adequacy of counsel's performance and prejudice are mixed questions of law and fact to which that presumption does not apply. *See McQueen v. Scroggy*, 99 F.3d 1302, 1310 (6th Cir. 1996). Therefore, we must independently review the state appellate court's conclusion that White did not receive ineffective assistance of counsel.

### III.

Respondent urges us to reverse the opinion of the district court, arguing that the only strategy available to McCrae was to attack the victim's credibility because White had confessed to raping the victim to both the police and McCrae and because of his refusal to assist with his own defense.  He

*v. Alabama*, 287 U.S. 45, 57, 53 S.Ct. 55, 77 L.Ed. 158 (1932). In *Strickland v. Washington*, the Supreme Court established that "the benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." 466 U.S. 668, 686, 104 S.Ct. 2052, 2064 (1984). The *Strickland* Court set out a two-part inquiry to determine whether a counsel's assistance is constitutionally ineffective: a showing of seriously deficient performance coupled with a showing that the deficient performance prejudiced the defense. *Id.* at 687, 104 S.Ct. at 2064.

The first step involves an inquiry into whether counsel's conduct fell below an objective standard of reasonableness, such that counsel's "identified acts and omissions were outside the wide range of professionally competent assistance." *Id.* at 690, 104 S.Ct. at 2066. Counsel has an "overarching duty to advocate the defendant's cause and the more particular duties to consult with the defendant on important decisions and to keep the defendant informed of important developments in the course of the prosecution." *Id.* at 688, 104 S.Ct. at 2065. Counsel also must demonstrate "such skill and knowledge as will render the trial a reliable adversarial testing process." *Id.* These are not counsel's only obligations and do not "form a checklist for judicial evaluation of attorney performance." *Id.* However, examination as to whether counsel met such obligations provides insight into determining whether counsel's assistance was objectively reasonable. In assessing a deficient performance, reviewing courts must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Tucker v. Prelesnik*, 181 F.3d 747, 754 (6th Cir. 1999) (overruled on other grounds) (citation omitted). The *Strickland* Court cautioned that courts must take care to avoid "second-guess[ing]" strategic decisions that did not prove successful. *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065.

Q:   And you ran home because you were afraid he was going to tell your mother that you had been doing this?

A:   No, I wasn't.

J.A. at 538-45.

Several other witnesses testified regarding the uncharged sexual intercourse incident on direct examination, without objection by McCrae, and on cross-examination by McCrae. Much of this testimony corroborated the victim's statements about the act of sexual intercourse between herself and White. For example, on direct examination, Detective Jackson testified without objection that White had admitted to numerous acts of fondling and engaging in oral sex with the victim, and to "one act of intercourse which had taken place on a Saturday at his mother's home. . . ." J.A. at 569. Later, in response to a question by McCrae, Detective Pratt testified that:

A:   [White] told us that the time he had had. . . .the one time he had had sexual intercourse with Juanita, that it had taken place at his mother's house. They had gone up to her house that day. Juanita and himself. And that she had been transported to the hopsital or to a nursing home. And that he had taken [Juanita] into either the living room or her bedroom, and his mother's bedroom, and had had intercourse with her on the bed.

J.A. at 592-93. Angela Kemper also testified without objection that the victim had told her that, in addition to the numerous acts of fondling and oral sex that had gone on over the past seven years, there had been one incident of intercourse that had occurred just a few weeks before White was indicted.

At the close of the State's case-in-chief, McCrae requested that the judge prohibit the prosecutor from amending the indictment to include the uncharged act of intercourse from 1988. In response, the prosecutor stated, "[a]s to the May

incident, we haven't moved to amend the indictment, and if anyone made a big thing about the May incident it was McCrae in his interminable cross examination on the issue." J.A. at 662.

During the presentation of evidence on White's behalf, McCrae questioned the victim's mother about the uncharged act of sexual intercourse, particularly with respect to White's confession to her about the incident:

Q: Ben told you that something happened at his mother's house?

A: Yes. After I confronted him about what had been said about him and her before, and I asked him about it and he said yes, and I asked Juanita if they had ever had sexual intercourse, and he said yes, on his mother's bed.

Q: And those were his exact words and those were her exact words and that was in 1988?

A: Yes, this year.

Q: Was it said in such a way that you could identify the particular Saturday that they were talking about?

A: The day that his mother was taken to the nursing home.

J.A. at 678.

Q: When you said he said this to you, did he say those exact words to you or did he say only what you just said recently, yes, on my mother's bed?

A: His words were to me, Juanita lied. She's not perfect either. We did have sex on my mother's bed.

J.A. at 684.

Q: But you didn't talk about it all this particular time?

A: Yes, I did. I asked him why he had been fooling with Juanita. Why Juanita didn't tell me. She said she was afraid. He's told her if you tell anyone I'll go to prison. And she didn't want to hurt his feelings and didn't want to hurt my feelings. I asked why he was doing it, and how long it had been going on, and that's when he told me Juanita's not perfect either. She's lied to you. And we have had sex. And that's when I asked him to leave.

J.A. at 688.

At trial, McCrae also pursued the theory that the victim and her mother had lied about the allegations in the indictment as well as the act of sexual intercourse in an attempt to keep White from leaving them. He attempted to show that shortly before the victim told her mother of the sexual intercourse incident, the victim had learned that White was planning to leave the family for another woman, and that the victim fabricated the story about the intercourse incident to punish him for this. Both the victim and her mother testified that they did not know that White was seeing another woman or that he was planning to leave them. As an alternative theory, McCrae attempted to show that the victim and her mother wanted to get White sent to jail for long enough so that they could leave town after taking all of White's money.

During his closing argument, McCrae spent a considerable amount of time talking about the 1988 incident of sexual intercourse, attempting to convince the jury that the victim had lied about the incident. He focused on the fact that the victim had not told her mother about the incident until two weeks after it happened, too late for any tests to corroborate her story. Before the case went to the jury, McCrae did not ask for a limiting instruction with regard to the intercourse incident.

II.

The Sixth Amendment guarantees all defendants the right to constitutionally effective assistance of counsel. *See Powell*