NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 12a0512n.06

No. 11-1193

FILED

May 17, 2012

LEONARD GREEN, Clerk

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

DAVID DUYST,

    Petitioner-Appellant,

v.

LLOYD RAPELJE,

    Respondent-Appellee.

)
)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE EASTERN
DISTRICT OF MICHIGAN

O P I N I O N

BEFORE:    MARTIN and McKEAGUE, Circuit Judges; and CALDWELL, District Judge.[*]

**McKeague, Circuit Judge.**  Petitioner David Duyst was convicted in a jury trial of first-degree murder and possession of a firearm during the commission of a felony. He was sentenced to life in prison without the possibility of parole for the murder conviction, to be served consecutively to two years' imprisonment for the felony-firearm conviction. *People v. Duyst*, No. 234482, 2003 WL 21921163, at *1 (Mich. Ct. App. Aug. 12, 2003). In his petition for habeas corpus, Duyst raised three distinct ineffective assistance of counsel claims. The district court denied the petition. Because counsel performed effectively and any error did not result in prejudice, we **AFFIRM** the judgment of the district court.

---

[*]The Honorable Karen K. Caldwell, United States District Judge for the Eastern District of Kentucky, sitting by designation.

## I. BACKGROUND

**A. Factual Background**

This case arises from the death of Petitioner's wife, Sandra Duyst, on March 29, 2000. She died of two gunshot wounds to the head. Petitioner told police that he was asleep in another room when he heard a shot, ran to the bedroom, and found Sandra in the bed with a gun in her hand. He called 911 and reported that his wife had shot herself.

Police and emergency medical personnel arrived at the scene and did not find anything immediately inconsistent with a suicide. Dr. Stephen Cohle, a forensic pathologist, conducted an autopsy and his initial examination lined up with the case history he was provided (suicide). Upon closer inspection, however, he discovered a second entry wound above the initial wound. He believed that the damage caused by what he determined to be the first wound would have rendered the victim immediately unconscious and unable to pull the trigger a second time. He ruled the case a homicide. Dr. Vincent DiMaio was asked to render a second opinion, and he came to the same conclusion—that the first gunshot would have been completely incapacitating and that the death was a homicide.

Petitioner took two polygraph tests in which he denied any involvement in his wife's death. Both examiners concluded that he was being truthful. Nonetheless, Petitioner was charged with first-degree murder and possession of a firearm during the commission of a felony. The defense theory at trial was that Sandra Duyst committed suicide and the gun had accidentally double-fired after a single trigger-pull. The district court provided the following summary of the trial:

Tim, the 11-year-old son of the Duysts, testified that the evening before his mother's death she seemed to be her usual self. He and his brother shared an upstairs bedroom; his parents' bedroom was on the main floor. When he woke up on the morning of his mother's death, he heard two loud noises that sounded to him like two loud piano cords [sic]. About ten seconds after he heard the loud noises, he heard his father move from the family room, through the kitchen and hallway and into the bedroom. He heard his father open the bedroom door forcefully. Tim testified that the door to his bedroom was shut when he heard the loud noises and his father's subsequent footsteps. He testified that his mother was frightened of guns and did not own one.

Erica Duyst, Tim's 13-year-old sister, testified that the night before her mother died, she saw Sandra in bed doing crossword puzzles . . . . The next morning, she was awakened by the sound of her father running upstairs. She heard urgent voices and left her bedroom. She was told to stay [in her upstairs bedroom] with her brother Tim. Erica also testified that, in November 1998, her mother suffered serious injuries when she was kicked by a horse she owned, Dexter. Many additional witnesses testified that Sandra told them that her serious injuries were caused by her horse. Erica testified that after her mother was released from the hospital, her mother and father fought more frequently and her mother seemed depressed.

David Duyst, Jr., testified that his mother seemed to be normal on the day before her death. On the morning of March 29, 2000, David, Jr., was lying in bed when he heard two loud bangs, approximately half a second apart. He then heard footsteps coming from the TV room, through the kitchen, and then heard the bedroom door violently opened. He heard Petitioner on the phone. David, Jr., went to the stairway to go downstairs and saw his father on the stairs. His father was on the phone and told David, Jr., that Sandra had shot herself. David, Jr., testified that his mother did not like guns.

Sheriff's deputy Daniel J. Scalici testified that he was contacted on the morning of March 29, 2000 and told to report to the Duyst home, where a suicide had been reported. When he arrived at the home, several other deputies were present. He entered the bedroom and observed a great deal of blood on the bed. Two shell casings were recovered, one on the night stand, the other on the floor. Scalici had a brief conversation with Petitioner, during which Petitioner explained that he had fallen asleep on the couch of the TV room and was awakened by a gunshot. He immediately went to the bedroom, where he found his wife and then called 911. Petitioner told Scalici that the gun in the bedroom was his and he had purchased it weeks earlier.

Scalici left the crime scene to attend the autopsy, performed by Dr. Stephen Cohle . . . . The medical examiner indicated to Scalici that the death would not be ruled a suicide.

Scalici testified that in a subsequent conversation with Petitioner he admitted that he was involved in an affair with one of his employees, Linda Ryan.

David DeHaan testified that he was employed in the Kent County Sheriff's Office in the scientific support unit. He responded to the report of a shooting at the Duyst home. When he arrived at the scene, he was informed that the death was a suicide. He photographed the scene. After the autopsy revealed two bullet entry wounds, he returned to the crime scene. He discovered that the room had been cleaned up. The bedding had been pulled off the bed and placed in plastic bags.

Dr. Cohle testified concerning the autopsy. Before performing the autopsy, he received a case history informing him that [Sandra] was alone in her bedroom when her husband heard a loud noise coming from that room. He went to the bedroom and discovered her with a large amount of blood coming from her head. Dr. Cohle testified that during the course of the autopsy he examined Sandra's hands to look for gunshot residue. He found none. He also examined the firearm used in the shooting and saw blood spatter on the weapon. Given that he was informed that this was a suicide and that he saw blood spatter on the weapon, he expected to find blood spattering on Sandra's hands. He did not. Dr. Cohle testified that he discovered two bullet entry wounds and two exit wounds. He was able to conclude based upon the characteristics of the entry wounds that both were made by the gun being in loose contact with the scalp. Dr. Cohle determined that the first bullet wound would have rendered Sandra unconscious, and, although heartbeat and respiration may have continued for a bit, she was essentially dead. She would have been completely incapacitated and incapable of any voluntary movement. Dr. Cohle testified that after sustaining the first gunshot wound, Sandra would have been incapable of pulling the trigger a second time. Dr. Cohle concluded that the manner of Sandra's death was homicide.

At the request of the prosecution, Dr. Cohle did not immediately issue a death certificate; instead, he solicited a second opinion on the manner of death from another forensic pathologist, Vincent DiMaio.

Dr. DiMaio testified that he reviewed the autopsy report, photographs of the victim and of the weapon, and a police investigative file. He testified that it would have been impossible for Sandra to inflict the second bullet wound because of the nature of the injuries caused by the first wound.

The clothing worn by Petitioner on the day of Sandra's death was submitted to the State Police evidentiary laboratory. Rodney Wolfarth, a biology unit supervisor, testified that he performed a visual inspection of Petitioner's clothing without using a magnifying glass or microscope and detected no evidence of blood on the clothing.

Jeffery Crump, who was employed at the Michigan State Police Crime Lab as a firearms examiner, testified as an expert in firearms. He testified that he test-fired the weapon that caused Sandra's death. He test-fired the gun six times.

The gun worked properly. He also tested the trigger pull and found it to require between 8-1/4 and 8-1/2 pounds of weight to get the trigger to pull. The factory specifications for this type of firearm are between eight and ten pounds. This particular firearm required the same weight for initial and subsequent trigger pulls.

Bradford Bacheldor [sic] also testified for the prosecution as an expert witness in firearms. He testified that the gun was test-fired by his son and appeared to be functioning normally. He also testified that the number of safety mechanisms inherent in this firearm to prevent accidental firing appeared to be functioning properly.

Rod Englert testified as an expert in crime scene reconstruction. He testified that he examined the pillows and fitted sheets from the crime scene and Petitioner's clothing. He testified that he observed a high-velocity mist pattern of blood spatter on the fitted sheet and pillows. He also observed a void in the pattern consistent with something having been present at the time the shots were fired to intercept the high velocity mist and prevent it from being deposited on the sheet. He testified that the void was consistent with someone firing the fatal shots while standing behind Sandra. That person would have intercepted some of the high velocity blood spatter which would otherwise have landed on the sheets. He found evidence of blood spatter on both sides of the gun. He concluded that the absence of blood spatter on Sandra's hands indicated that she did not fire the gun.

Englert examined Petitioner's clothing for evidence of high-velocity blood mist. Using a magnifying glass and high-intensity lights, he located numerous spots on Petitioner's shirt that appeared to be blood. He testified these spots were consistent with high-velocity blood mist. He testified that these spots were inconsistent with coughed or expired blood.

An expert in DNA analysis, Shawn Weiss, testified that three of the spots identified by Englert as high-velocity blood spatter matched Sandra's DNA on all eight genetic markers tested. He testified that the probability of randomly selecting an unrelated individual with a DNA statistic consistent with Sandra's on this stain is one in 16.6 million for the Caucasian population.

Mary Ellen Spring, Sandra's sister, testified that in the spring of 1999, Sandra called Spring and said, if anything should happen to her, she had left a note in the china cabinet. After the phone call, she had a prayer group meeting and told the other members about her sister's phone call. As time passed, Spring forgot about the conversation and the note. Spring was reminded of the letter by a member of her prayer group after her sister's death. Spring testified that she immediately contacted the police, who found a letter inside the china cabinet. The parties stipulated that a fingerprint on the letter belonged to Sandra and that saliva found on the envelope matched Sandra's. The letter stated that the head injuries Sandra sustained on November 19, 1998, were not caused by her horse Dexter, but by Petitioner. It also

stated that, if anything happened to her, Petitioner should be looked at as a suspect and that she would never commit suicide.

Linda Ryan testified that beginning in 1995, she worked for Petitioner and his partner, Larry Bos, Sr., at their insurance company, Northwestern Mutual Life. The partnership dissolved in 1999, and Ryan continued working with Petitioner. In July 1998, she began an affair with Petitioner. She was aware that Petitioner and Sandra argued often. Petitioner informed her that Sandra had tried to commit suicide three times. She and Petitioner discussed divorcing their respective spouses so that they could marry one another. Ryan's divorce from her husband was final on February 7, 2000. Ryan took a leave of absence in March 2000 because she was having difficulty with her ex-husband and because Petitioner had not gotten divorced. She wanted him to choose between her and Sandra. Between the time she began her leave and March 27, Ryan only saw Petitioner once in person at an office meeting, though she spoke to him on the phone more than that. On March 27, 2000, Petitioner came to her apartment and told her he had made the decision to divorce Sandra. Petitioner told Ryan that Sandra had been looking at the apartment section of the newspaper the previous Sunday and that, whether she left or not, he would file for divorce. At 11:00 p.m. that evening, Ryan visited a website that allows users to design their own engagement rings.

The prosecution also presented evidence that Petitioner's income declined in the years preceding Sandra's death and that Sandra was insured for in excess of half a million dollars.

Petitioner testified in his own defense and denied killing his wife. Petitioner first testified generally about his upbringing and his family. He testified about the head injuries sustained by Sandra on November 19, 1998. He testified that, on that date, he entered the horse barn that they maintained on their property and heard moaning coming from Dexter's stall. He found Sandra slumped on the ground. He went into the stall and helped her out. She had blood streaming down her face and told him that Dexter had repeatedly kicked her. Petitioner called 911 and Sandra was hospitalized for seven days. After the accident, Sandra became severely depressed, gained weight, and had memory problems. He testified that between the time of the accident and when she died, Sandra attempted suicide three times.

Petitioner admitted that he began an affair with Linda Ryan in 1998. He testified that on February 29, 2000, he had a meeting with a divorce lawyer. In the beginning of March 2000, Ryan took a leave of absence from work due to pressures related to her divorce. Petitioner testified that Ryan never gave him an ultimatum to choose between her and Sandra. He testified that on Friday, March 24, 2000, he informed Sandra that he was going to file for divorce and that he had an excellent chance of gaining custody of the children. Sandra did not respond. On Sunday, March 26, he observed Sandra looking through the apartments-for-rent section of the newspaper. On March 27, he went to Ryan's house to tell her that he had decided to

file for divorce. On the evening of March 28, Petitioner fell asleep on the couch. He was awakened by a loud bang. He ran to the bedroom, opened the door, and saw Sandra on the bed, gurgling and coughing. After a few moments, he noticed the gun in Sandra's hand; it was covered by a sheet. He took the gun out of her hand and removed the magazine. Petitioner then called 911.

Petitioner testified that he purchased the gun in January 2000. He was prompted to purchase the gun because he and his deceased brother used to enjoy going to the firing range together. Additionally, his son, David, Jr., was interested in guns and this was something he felt they could share.

The defense presented two expert witnesses in psychiatry and psychology. Both testified that Sandra's behavior prior to her death was consistent with someone who was contemplating suicide. The defense presented numerous witnesses who testified that Sandra's behavior was markedly different since the head injury in 1998. The defense also presented testimony from several witnesses that the amount of Sandra's life insurance policy was appropriate.

*Duyst v. Rapelje*, No. 2:08-CV-11728, 2011 WL 528768, at *1-5 (E.D. Mich. Feb. 8, 2011). After twenty-four days of trial and less than six hours of deliberation, the jury returned with a verdict of guilty on both counts.

## B. Procedural History

Petitioner appealed, retaining the same counsel he had at trial. The Michigan Court of Appeals affirmed his conviction. *People v. Duyst*, No. 234482, 2003 WL 21921163 (Mich. Ct. App. Aug. 12, 2003). The Michigan Supreme Court denied review. *People v. Duyst*, 469 Mich. 999, 675 N.W.2d 592 (Mich. 2004) (table).

Petitioner, with new counsel, filed a motion for post-conviction relief in Kent County Circuit Court under Mich. Ct. Rule 6.500 *et seq*. He asserted, for the first time, ineffective assistance of trial counsel. The state trial court found Petitioner's ineffective assistance claims procedurally defaulted under Mich. Ct. Rule 6.508(D) because he did not raise them on direct appeal and was unable to

establish good cause.[1]  *People v. Duyst*, No. 00-09779-FC (Cir. Ct. Apr. 6, 2006). The Michigan

Court of Appeals denied leave to appeal,  citing Mich. Ct. Rule 6.508(D).  The Michigan Supreme

Court also denied leave to appeal, citing Mich. Ct. Rule 6.508(D), with two justices dissenting.

*People v. Duyst*, 480 Mich. 1055, 743 N.W.2d 885 (Mich. 2008).

Petitioner then filed a habeas petition in the United States District Court for the Eastern

District of Michigan.  He requested release of physical evidence for testing and an evidentiary

hearing and claimed that his trial counsel was ineffective.  The district granted his requests, and, after

a two-day evidentiary hearing, denied habeas relief.  Petitioner timely appealed.

## II.  ANALYSIS

### A.  Standard of Review

Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), a federal court may

not grant a writ of habeas corpus unless it concludes that the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable
> application of, clearly established Federal law, as determined by the Supreme Court
> of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the
> facts in light of the evidence presented in the State court proceeding.

---

[1]The relevant portion of Mich. Ct. Rule 6.508(D) provides: "Entitlement to Relief.  The defendant has the burden of establishing entitlement to the relief requested. The court may not grant relief to the defendant if the motion . . . (3) alleges grounds for relief, other than jurisdictional defects, which could have been raised on appeal from the conviction and sentence or in a prior motion under this subchapter, unless the defendant demonstrates (a) good cause for failure to raise such grounds on appeal or in the prior motion, and (b) actual prejudice from the alleged irregularities that support the claim for relief."

28 U.S.C. § 2254(d). However, "AEDPA's deferential standard of review applies only to state-court adjudications on the merits. Where AEDPA deference does not apply, state-court adjudications of legal issues are reviewed de novo and state-court fact findings are reviewed only for clear error." *Jalowiec v. Bradshaw*, 657 F.3d 293, 301-02 (6th Cir. 2011) (citing *Cone v. Bell*, 556 U.S. 449 (2009)). The district court's legal conclusions, including the ultimate decision to grant or deny the writ, are reviewed de novo and its factual findings for clear error. *Satterlee v. Wolfenbarger*, 453 F.3d 362, 365 (6th Cir. 2006).

## B. Procedural Default

The State argues that Petitioner procedurally defaulted his ineffective assistance of counsel claims and that he is unable to establish cause. "Whether a state court rested its holding on procedural default so as to bar federal habeas review is a question of law that we review de novo." *Combs v. Coyle*, 205 F.3d 269, 275 (6th Cir. 2000).

"It is well established that '[i]n all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.'" *Combs*, 205 F.3d at 274 (quoting *Coleman v. Thompson*, 501 U.S. 722, 750 (1991)). "A habeas petitioner procedurally defaults a claim if: (1) the petitioner fails to comply with a state procedural rule; (2) the state courts enforce the rule; (3) the state procedural rule is an adequate and independent state ground for denying review of a federal constitutional claim; and (4) the petitioner cannot show cause and prejudice excusing

the default." *Wogenstahl v. Mitchell*, 668 F.3d 307, 321 (6th Cir. 2012) (quoting *Guilmette v. Howes*, 624 F.3d 286, 290 (6th Cir. 2010) (en banc)).

Prongs (1) and (2) have been met here. Form orders citing Mich. Ct. Rule 6.508(D) are "unexplained," and we "look to the last reasoned state court opinion to determine the basis for the state court's rejection of [Petitioner's] claim." *Guilmette*, 624 F.3d at 291. Here, the last reasoned state court opinion clearly rested its rejection of Petitioner's claim on procedural grounds.

Whether prongs (3) and (4) have been met is less clear. In his motion for post-conviction relief, Petitioner argued that he met the "good cause" requirement of Mich. Ct. Rule 6.508(D) because his trial and appellate counsel were the same, so the first opportunity to raise ineffective assistance of trial counsel was at the post-conviction stage. The state trial court was unpersuaded and found that Petitioner failed to establish good cause because his trial/appellate counsel was retained rather than appointed, stating Petitioner could not "circumvent the 'good cause' requirement simply by asserting that his choice to have his retained counsel also pursue his appeal supplies the 'good cause' requirement." *People v. Duyst*, No. 00-09779-FC (Cir. Ct. Apr. 6, 2006). On habeas review, the federal district court found no reason to distinguish between appointed and retained counsel and declined to apply a procedural bar. *Duyst*, 2011 WL 528768, at *9. It cited *Hicks v. Collins*, 384 F.3d 204, 211 (6th Cir. 2004), where this Court noted, in the context of analyzing Ohio's res judicata rule, that "if the defendant was represented by the same counsel at trial and on direct appeal, claims of ineffective assistance of *trial* counsel are not defaulted because appellate counsel will rarely assert his own ineffectiveness at trial."

Resolution of the procedural default question would require either a complicated analysis of whether the state trial court's application of Mich. Ct. Rule 6.508(D) was an "adequate and independent state ground"[2] or charting new territory in our own case law.[3] The Supreme Court has noted that federal courts are not required to address a procedural default issue before deciding against a petitioner on the merits. *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) ("Judicial economy might counsel giving the [other] question priority, for example, if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law."); *cf.* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State"). This Court has previously relied on *Lambrix* to bypass the procedural default question,

---

[2]"A state procedural rule is adequate if it was 'firmly established' and 'regularly followed' by the time it was applied in this case." *Monzo v. Edwards*, 281 F.3d 568, 577 (6th Cir. 2002) (quoting *Ford v. Georgia*, 498 U.S. 411, 423-24 (1991)). *Hicks v. Straub*, 377 F.3d 538, 557 (6th Cir. 2004) found that Mich. Ct. Rule 6.508(D)(3) was "firmly established and regularly followed" by the time of the appeal at issue in that case and cited to previous cases where we found that the rule was being regularly followed as of 1990. *E.g.*, *Simpson v. Jones*, 238 F.3d 399, 407 (6th Cir. 2000). However, in those cases, we considered whether the general rule that claims not raised on direct appeal are procedurally barred was firmly established and regularly followed. This case arguably presents the distinct question of whether what constitutes "good cause" for failing to raise a claim on direct appeal is firmly established and regularly followed. *Cf. White v. Schotten*, 201 F.3d 743, 751 (6th Cir. 2000) (reviewing Ohio case law to demonstrate that "the state courts have not achieved consensus on what constitutes 'good cause' to excuse non-compliance with [an Ohio procedural rule]"), *overruled on other grounds by Lopez v. Wilson*, 426 F.3d 339 (6th Cir. 2005) (en banc).

[3]This Circuit has never squarely determined whether having the same counsel at trial and on appeal constitutes cause excusing procedural default of an ineffectiveness claim. *Hicks*'s conclusion was based on Ohio's judicially recognized exception to its own res judicata rule. 384 F.3d at 211.

which was complicated and unnecessary to the court's determination of the case. *Hudson v. Jones*, 351 F.3d 212, 215-16 (6th Cir. 2003). We do so here as well and proceed directly to the merits.

## C. Ineffective Assistance of Counsel

To establish a claim of ineffective assistance of counsel, Petitioner must first demonstrate that counsel's performance "fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. "[T]here is a strong presumption in favor of finding that counsel's performance 'falls within the wide range of reasonable professional assistance.'" *White v. Mitchell*, 431 F.3d 517, 528 (6th Cir. 2005) (quoting *Strickland*, 466 U.S. at 689). "Even under *de novo* review, the standard for judging counsel's representation is a most deferential one." *Harrington v. Richter*, -- U.S. --, 131 S.Ct. 770, 788 (2011). Second, the Petitioner must show he was prejudiced by counsel's deficient performance, meaning that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687.

Petitioner claims that his trial counsel performed ineffectively in three respects: (1) failing to object to, and eventually stipulating to the admission of, Mrs. Duyst's inculpatory note, (2) failing to adequately confront the State's blood spatter evidence, and (3) failing to obtain a ballistics expert. Because the state courts did not review the merits of Petitioner's claims, this Court reviews them de novo. *Maples v. Stegall*, 340 F.3d 433, 436 (6th Cir. 2003).

### 1. Note From the Grave

The note in question was written thirteen months before Mrs. Duyst's death and read as follows:

February 28, 1999

To anyone interested in what happened to me, look to David Duyst, Sr. On November 19th, my accident was no accident. David beat me with a hammer/axe. He came from behind while I was in Dexter's stall. He hit me repeatedly. Only when I told him I would sell my horse and support him in leaving the partnership he had formed with my dad would he let me go. I ran to Gray's house when David called 911. I feared he would come back and kill me.

If anything has happened to me, look first to David Duyst, Sr. He could be my killer. I would <u>never</u>[4] commit suicide. He may have killed me.

Respectfully,
Sandra A. Duyst

Petitioner's trial counsel, David Dodge, had originally objected to the note on four grounds. At a preliminary hearing in state court, Dodge argued that the note was inadmissible because it was (1) unreliable, (2) irrelevant, (3) inadmissible hearsay, and (4) prior bad act evidence inadmissible under Michigan Rule of Evidence 404(b). The trial court overruled the objections but noted they were preserved and could be raised later.

Dodge then decided to change course and stipulate to the note's admission. After Petitioner was charged, Dodge contacted a forensic pathologist, Dr. Laurence Simson, to review the pathology reports. Dr. Simson rendered an opinion consistent with the State's pathologists—that the area of the brain affected would have caused a complete shutdown precluding even an involuntary reflexive movement after the first shot—and stated he could not testify for the defense. Dodge also consulted a forensic neurologist, who came to the same conclusion as Dr. Simson. These medical opinions, Dodge explained, were surprising and caused him to change the direction of the defense strategy—specifically, he believed that in the face of such evidence weighing against a finding of

---

[4]The word "never" was underlined three times in the letter.

suicide, he needed to present a stronger picture of why Mrs. Duyst would have, in fact, committed suicide, using evidence more compelling than the usual patterns of depression and alienation. This led him to agree to the admission of Ms. Duyst's note in order to support a theory that Ms. Duyst planned to frame Petitioner. At trial, Dodge presented two experts in psychiatry and psychology who testified that a person's strong assertion that she would never commit suicide may indicate that she is actually contemplating it. Counsel also presented several witnesses who testified that Mrs. Duyst had told them her November 19 accident was caused by a kick to her head by her horse, and one witness testified that she thought of Mrs. Duyst as a strong-willed person and believed she would have told others if assaulted by her husband.

Counsel's decision was reasonable trial strategy. Dodge had investigated other causes of death, including the possibility of an intruder, and made the judgment call that suicide was the best (and perhaps only) theory. He further determined that Mrs. Duyst's note was not merely cumulative evidence of suicide but probative of a framing theory, as it accounted for "how a person who was very strong-willed, very determined would not only take her own life but would also take the life of her husband at the same time." R. 30, Evidentiary Hearing Vol. 1, at 69. As the district court concluded, the record "reveals a carefully considered decision, reached with awareness of the relevant law, an appreciation for the challenges the defense faced in light of substantial evidence against Petitioner, and a consideration of the practices of the trial court." *Duyst*, 2011 WL 528768, at *12. Such "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable[.]" *Strickland*, 466 U.S. at 690. Counsel was not ineffective on this ground.

Petitioner also contends that counsel should have asked for a limiting instruction directing the jury not to consider the top portion of the note for substantive truth and cites *White v. McAninch*, 235 F.3d 988, 997 (6th Cir. 2000), in support. Dodge acknowledged that this was a "legitimate argument" but said it was "too fine with the two head shots we had in this case" and that in his view, "we had much bigger issues to deal with that we did not go down to every potential other instruction or issue that might have been mentioned and there certainly could have been a request[.]" R. 30, Evidentiary Hearing Vol. 1, at 83-84.

We find no merit to this argument either. The Supreme Court has acknowledged that an attorney "can avoid activities that appear distractive from more important duties" and is entitled to "balance limited resources in accord with effective trial tactics and strategies." *Richter*, 131 S. Ct. at 789 (internal quotation marks omitted). Even if the failure to request a limiting instruction here were not a product of resource allocation but of carelessness, such isolated error does not rise to ineffective assistance in this case, where counsel's "overall performance indicates active and capable advocacy." *Id*. at 791. And, we could hardly find that the lack of such limiting instruction so prejudiced Petitioner he was deprived of a fair trial. This Court's decision in *McAninch* is easily distinguishable, where our finding that defense counsel was ineffective for failing to request a limiting instruction was based on his gross unpreparedness, which caused the harm that required the limiting instruction in the first place. *See* 235 F.3d at 997.

## 2. Blood Spatter Evidence

Petitioner makes three sub-arguments under this claim: (a) counsel failed to obtain a true blood spatter expert to undertake a hands-on examination of the blood-stained sheet and clothing,

(b) counsel ignored the advice of consultants to present the results of an experiment that could have impeached the State's expert, and (c) counsel failed to adequately investigate the State expert's background. Dr. Herbert MacDonnell testified as a blood spatter expert for Petitioner at his evidentiary hearing below.

Petitioner's first point is grounded on assertions that Toby Wolson, an expert the defense consulted for a preliminary review, was not a true blood spatter expert and that sending him photos rather than arranging for an in-person examination was inadequate.

We fail to see how Wolson was insufficiently qualified. Wolson possessed a bachelor's degree in science and a master's in serology from Michigan State University and had worked in the Miami-Dade Police Department's Forensic Biology section for nearly twenty years. Petitioner seizes on Dodge's characterization of Wolson having a "sub-expertise" in blood spatter work without explaining why that is insufficient or otherwise casting doubt on Wolson's credentials.[5] Essentially, Petitioner argues that Wolson was not the best expert, an argument this Court has previously found to fall short of the *Strickland* hurdles. *Reynolds v. Bagley*, 498 F.3d 549, 557 (6th Cir. 2007) ("At bottom, [petitioner] is claiming [defense experts] were not the 'best' experts. While this may or may not be true, it is not enough to clear the *Strickland* prejudice hurdle, let alone the *Strickland* performance hurdle."). As the Supreme Court has said, "*Strickland* does not enact Newton's third

---

[5]Petitioner's own proffered expert, Dr. MacDonnell, has testified as an expert in everything from fingerprint identification to breathalyzers to autoerotic masochism to footwear and tire wear patterns, in addition to blood spatter evidence. R. 31, Evidentiary Hearing Vol. 2, at 43-44. As his own expert demonstrates that one might have many areas of expertise or sub-expertise, Petitioner's argument on this point falls particularly flat.

law for the presentation of evidence, requiring for every prosecution expert an equal and opposite expert from the defense." *Richter*, 131 S. Ct. at 791.

The fact that counsel sent only photos to Wolson, rather than arranging for an in-person examination, also fails to rise to the level of ineffective assistance. Dodge sent Wolson photos of the clothing, bedding, and autopsy to review and asked for his opinion on the State's blood spatter evidence. Wolson concluded that he believed the State's expert, Rod Englert, was correct in this case. Petitioner's expert, Dr. MacDonnell, acknowledged that it is common for experts to receive and review photographs when rendering a preliminary opinion. MacDonnell testified, "[I]t's not unusual for me to only receive photographs, write a report based on it and never hear anything more about the case because I don't necessarily agree with the people that sent it to me." R. 31, Evidentiary Hearing Vol. 2, at 50. Dr. MacDonnell's own preliminary review at the request of Petitioner was also based solely on photos, and he noticed an inconsistent marking of the "void" area as well as a discrepancy that caused him to believe the sheet had been contaminated. He then suggested that he see the actual evidence. That Wolson did not notice such discrepancies and did not suggest that he would be able to give a more accurate opinion if he examined the articles in person does not indicate that Dodge was incompetent but merely that "the defense strategy did not work out as well as counsel had hoped." *Richter*, 131 S.Ct. at 790.

Of course, counsel has a duty to make reasonable investigations, to a point where he or she is able to make a reasoned judgment to continue or stop investigating a particular aspect of a case. *See Strickland*, 466 U.S. at 690-91 ("[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations

on investigation."). Counsel cannot, for example, insulate his or her decision by simply consulting an expert "and then either willfully or negligently keep[ing] himself in the dark about what that expert is doing, and what the basis for the expert's opinion is." *Richey v. Bradshaw*, 498 F.3d 344, 363 (6th Cir. 2007). This is not what happened here. Dodge did not contact Wolson and review his opinion in a vacuum. Nor did he leave his experts to their own devices and rely blindly on their conclusions. Before contacting Wolson, Dodge consulted with Leonard Speckin for expert advice on crime scene reconstruction. He considered Speckin to have an excellent reputation in his field. Speckin examined the physical evidence from the crime scene at both the sheriff's department and in his laboratory but was ultimately not supportive as a witness. Speckin, however, assisted Dodge in preparing for cross-examination. Because Speckin was not specifically a blood spatter expert, Dodge and Speckin attempted to locate a blood spatter expert who was a critic of Englert. Together, they identified Wolson as a possible expert witness. Considering that Speckin had personally examined the evidence in his laboratory, under high lights, and was unable to give favorable testimony, Dodge was in a position to accept Wolson's opinion and to make the decision that continued efforts to find an expert to counter the State's expert were not necessary. *See id*. at 363 ("The point is not that [counsel] had a duty to shop around for another expert who would refute the conclusions of . . . the State's experts. The point is that [counsel] had a duty to know enough to make a reasoned determination about whether he should abandon a possible defense based on his expert's opinion.").

Far from being ineffective, Dodge diligently investigated possible defenses and searched for favorable experts. His decision to discontinue further investigation was carefully informed. That he was ultimately unsuccessful in his efforts does not accrue to a finding of ineffectiveness.

Petitioner's latter two contentions on the blood spatter claim also do not constitute ineffective assistance. Defense counsel's retained experts, Speckin and David Townshend (who was consulted as a ballistics expert), conducted an experiment in which they shot an anesthetized, terminally ill sheep with the same type of gun and bullets that were involved in Mrs. Duyst's death. The experiment resulted in no high velocity impact blood spatter on the shooter's hands or clothing. Speckin opined that the experiment would be valuable in impeaching Englert. Dodge ultimately did not introduce the experiment at trial, in order to prevent the prosecution from drawing out unfavorable testimony from Townshend and Speckin regarding their conclusions on the ballistics and blood evidence.

Petitioner contends, however, that it was unreasonable for counsel not to replicate the experiment with different experts who could then testify. We disagree. It was eminently reasonable for Dodge to conclude that the extra time and expense required to reenact the experiment with other experts was not worthwhile, especially considering the experiment's limited probative value. The sheep experiment merely demonstrated that it would have been possible for a shooter not to get high impact blood spatter on himself and would have added nothing to the suicide theory put forth at trial. Further, new experts may have been asked from where the idea for the experiment came and why the original experimenters, Townshend and Speckin, did not testify. And, ultimately, even assuming the failure to reenact the experiment was deficient, Petitioner has not shown any prejudice flowing

from it.  The experiment would not have successfully impeached Englert, as Speckin suggested, because Englert admitted the possibility of a gunshot incident without back spatter.

We find the most merit in Petitioner's last contention.  While Dodge put forth a reasonable strategic explanation for failing to impeach Englert's background and qualifications (his read of Englert was that Englert was more an "advocate" than a mere witness and would have further authenticated himself to the jury if questioned on his background), Dodge admitted that he did not verify Englert's credentials or research his testimony at previous trials.  Thus, his decision not to question Englert's background was not an informed one.  We have previously found that "a lawyer cannot make a protected strategic decision without investigating the potential bases for it." *Couch v. Booker*, 632 F.3d 241, 246 (6th Cir. 2011).  However, Dodge did research Englert's background to the extent that he found Englert had detractors.  And the trial record reveals a prepared advocate who adequately cross-examined Englert on the substantive portions of his testimony.

While we note that "it is difficult to establish ineffective assistance when counsel's overall performance indicates active and capable advocacy," *Richter*, 131 S. Ct. at 791, we find the issue definitively resolved by the lack of any resulting prejudice.  In assessing the prejudice prong of *Strickland*, "[t]he likelihood of a different result must be substantial, not just conceivable." *Id.* at 792.  Petitioner did cast some doubt on Englert's credentials and expertise.  Some of Englert's post-graduate work turned out to be audited courses.  Englert claimed to have discovered blood where the FBI and the U.S. Army Criminal Investigation Laboratory had not.  He demonstrated unfamiliarity with hard sciences, math, and physics and insisted that he could recognize blood spatter patterns based on experience. However, Englert also persuasively testified regarding his substantial

experience and mentioned a study published by Dr. MacDonnell, Petitoner's own expert, in which a forensics test was given to two groups—one group of academics and one group of experienced police officers—and the degree-less but experienced group scored higher. And while Petitioner argued that Englert's testimony at Petitioner's trial was inconsistent with testimony Englert had given at other trials, the allegedly inconsistent testimony was consistent when read in context. We agree with the district court that any impeachment would not have caused the jury to seriously question Englert's credibility, much less affect the outcome at trial.

### 3. Ballistics Evidence

Lastly, Petitioner contends that counsel was ineffective for failing to discover a favorable ballistics expert in time for trial and, further, for failing to follow up with a ballistics expert counsel discovered after trial.

Dodge consulted with David Townshend, whom he considered a reputable expert, on firearm issues before, during, and after trial. Dodge had Townshend perform extensive testing on the gun, which included reenactments at the scene. He had Townshend obtain the history of the firearm model, the service history of the particular firearm, and literature on slam firing, double firing, chain firing, and chambering issues. Townshend spent over 100 hours investigating the case and met with Dodge at least ten times. According to Dodge, Townshend "did everything that he could think of and certainly way beyond what I would think of as far as trying to account for a chain fire/double-fire." R. 30, Evidentiary Hearing Vol. 1, at 135. Despite thorough research and testing, Townshend's conclusion was that "in this case in this instance with this firearm [a double fire] did not happen." *Id.* at 138. This more than adequately meets the requirement that counsel conduct a

reasonable investigation that can then support a reasonable professional judgment that further investigation is unnecessary.

Post-trial, Dodge continued his efforts to find evidence that would explain the events were not a homicide. He made contact with Frederick Wentling, another firearms expert, and asked him to review the trial testimony of one of the State's firearms experts, Brad Bachelder, but did not provide for a hands-on examination of the gun. Dodge testified that Wentling did not give him any information that Dodge did not already have, that Wentling had basically gone over the first 20-25% of Townshend's testing and research, and that Dodge decided it was not worth incurring more expense to go over the same ground Townshend had already covered. Petitioner contends that Wentling's testimony, even though inconclusive as to whether the gun actually double-fired on March 29, 2000, was valuable precisely because Wentling could testify that it was possible that the gun double-fired. This overlooks the fact that Dodge was already aware of the theoretical possibility that the gun could double-fire. Dodge stated, "I don't think there was any question that it's possible for a firearm to double-fire, slam-fire, chain-fire, that that mechanism is something that's documented. It's this particular firearm basically." *Id.* at 93. Based on Dodge's thorough investigation of the firearm with Townshend, he was entitled to make the strategic choice that such testimony was not worth presenting at trial. "Just as there is no expectation that competent counsel will be a flawless strategist or tactician, an attorney may not be faulted for a reasonable miscalculation or lack of foresight or for failing to prepare for what appear to be remote possibilities." *Richter*, 131 S. Ct. at 791. Dodge's failure to present testimony from a ballistics expert or follow up with Wentling were not constitutionally ineffective.

## III. CONCLUSION

Faced with substantial evidence against Petitioner and no experts who could testify favorably, defense counsel played the hand he was dealt to the best of his ability. Counsel's conduct reflected capable advocacy, awareness of relevant law, and thorough investigation of facts. The judgment of the district court is accordingly **AFFIRMED.**